MICHAEL LEE HUNTER,

        **Plaintiff,**

v.                                              Case No. 18-CV-1500

KELLY MUESKE and
TYSHEME WALKER,

        **Defendants.**

## DECISION AND ORDER

Plaintiff Michael Lee Hunter, who is represented by counsel and confined at Redgranite Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Hunter alleges that the defendants violated his constitutional rights when they failed to protect him from being attacked by his cellmate. The defendants filed a motion for summary judgment (ECF No. 53). The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 2, 22.)

### FACTS

*Parties*

At all times relevant plaintiff Michael Lee Hunter was an inmate confined at Redgranite Correctional Institution. (ECF No. 66, ¶ 1.) Defendant Kelly Mueske was the Unit Supervisor for the H-Unit housing unit at Redgranite, and her duties included overseeing bed assignments for the housing unit. (*Id.*, ¶¶ 5, 7-8.) Defendant Tysheme Walker was the second-shift correctional sergeant for H-Unit at Redgranite,

and his duties did not encompass housing issues or bed placements. (*Id.*, ¶¶ 16-17.) Non-defendant Donald Patterson was Hunter's cellmate from March 8, 2017, through December 6, 2017. (*Id.*, ¶¶ 3, 19.)

*Hunter and Patterson's Relationship*

Hunter states that he and Patterson had "issues" as cellmates from the very beginning of living together. (ECF No. 68, ¶ 7.) The issues started because Hunter had gas and, Patterson told him, he breathed too loud, but, according to Hunter, "more severe problems were quickly emerging." (ECF No. 65, ¶ 8.) Hunter states that "Patterson's verbal statements began amounting to serious threats" and he "soon recognized that his safety was in danger." (*Id.*, ¶ 9.)

Hunter states that the first threat Patterson made toward him happened in the first month of living together, but he does not provide details about the specific nature of the threat. (ECF No. 68, ¶ 14.) "On more than on occasion, Patterson told Hunter that he would beat him with a cribbage board while he slept." (*Id.*, ¶ 12.) "On another occasion, Patterson said he would 'whoop [Hunter's] ass' and would repeatedly tell him he needed to find a new cellmate." (*Id.*, ¶ 13.) Hunter does not state when Patterson made these threats.

Hunter spoke to non-defendant Sergeant Hess and asked to be moved to a different cell. (ECF No. 68, ¶ 15.) Hunter does not say when this conversation occurred. Hess told Hunter to complete an interview and information request form and give it to Unit Supervisor Mueske. (*Id.*, ¶ 16.) An information and interview request, Form DOC-761, is a way for an inmate to contact prison staff with a question or on an

2

issue. (ECF No. 66, ¶ 29.) Forms are available to inmates in the dayroom or inmates may request a form from staff. (*Id.*, ¶ 30.) The forms may be submitted by interdepartmental mail, or inmates may hand-deliver them to staff. (*Id.*, ¶ 31.) As discussed below, Hunter followed Hess's advice and submitted a form.

Despite their issues, it is undisputed that Hunter and Patterson had an "off and on" relationship, and there were periods when they got along, talking about sports and dogs and playing games together. (ECF No. 66, ¶ 26.) It is also undisputed that Hunter and Patterson sometimes hugged. (*Id.*, ¶ 27.)

*Hunter's Complaints to Mueske*

Hunter states that he sent his first information and interview request by interdepartmental mail to Mueske on March 15, 2017. (ECF No. 68, ¶ 19.) The defendants dispute this, stating that Hunter testified in his deposition that the first request he sent was the one he sent on March 25, 2017[1]. (*Id.*) Hunter does not provide details of what the March 15 request stated, but asserts he received no response, so he obtained carbon copy paper for future requests. (*Id.*, ¶ 20.) Hunter then submitted a request form on March 25, 2017, in which he stated, "Me and my celly are not getting along at all. It is like walking on eggshells[.] Please help." (*Id.*, ¶ 22.) It is undisputed that there is no evidence in the record that Mueske received this request form. (ECF No. 66, ¶ 42.)

---

[1] The defendants argue that the court should disregard Hunter's affidavit as a sham affidavit because it contradicts his deposition testimony. *See James v. Hale*, 959 F.3d 307, 311 (7th Cir. 2020). However, as discussed below, the court concludes that, even considering the affidavit, Hunter does not establish a genuine issue of material fact that the defendants failed to protect him.

On April 12, 2017, Hunter sent another request to Mueske in which he stated, "Ms. K. Muske [*sic*] again I am asking you to please move me, my celly is always mad at me, keeps threatening me. I fear for my life. Thank you!" (ECF No. 68, ¶ 23.) It is undisputed that Mueske *did* receive this request. Mueske states she met with Hunter in her office sometime shortly after April 12 because she was concerned about the threat to Hunter's life. (ECF No. 66, ¶ 47.) According to Mueske, Hunter did not discuss the contents of his April 12 request form and instead simply told her he wanted to be moved, without elaborating why. (*Id.*, ¶ 50.) Hunter did not describe any threats or explain why he was afraid of Patterson. (*Id.*, ¶ 51.)

Hunter disputes that Mueske spoke with him about the April 12 request form. (ECF No. 66, ¶ 47.) He states that the only response he ever received from Mueske on any of his complaints was a written comment on his April 12 request form that stated, "I do not accommodate roommate requests. Sorry." (ECF No. 68, ¶ 32.) Mueske states that it is her practice to write on all request forms as a way to indicate that she received them and had addressed the issue. (ECF No. 66, ¶ 35.) She does not dispute what she wrote on the April 12 request form but contends she wrote that while Hunter was in her office at the conclusion of their meeting. (*Id.*, ¶ 57.) She says she wrote the comment "because Hunter did not verbally indicate to her that he felt threatened, and she believed Hunter may have been trying to get a single cell or just a new cellmate." (*Id.*, ¶ 58.) Mueske also checked the box on the form that stated that Hunter "will not be interviewed." (*Id.*, ¶ 59.) Hunter states the checked box shows that Mueske did not

4

meet with him, but Mueske states she checked the box because she had just met with Hunter and did not need to interview him again. (*Id.*)

Hunter states he filed another information and interview request form, either on May 11 or June 11, 2017[2], where he stated, "Ms. Muski [*sic*], I just talked to you about all the request slips I sent you, you told me if they are hard to read you will toss them in the trash. You also told me that you are not making any moves." (ECF No. 68, ¶ 25.) There is no evidence in the record that Mueske received this form. (*Id.*)

It is undisputed that from July 2017 through December 6, 2017, Hunter did not submit any more information and interview requests to Mueske or that he otherwise discussed issues concerning Patterson with her. (ECF No. 66, ¶¶ 80-88.) Hunter states that he was frustrated by Mueske's inaction. (ECF No. 68, ¶ 26.)

*Hunter's Complaints to Walker*

Hunter also asserts that on several occasions he spoke with Walker about Patterson's behavior. (ECF No. 68, ¶ 41.) Even though Hunter cannot recall exactly when he spoke with Walker, he asserts that, "[o]n one occasion, Walker asked Hunter what was going wrong, and Hunter explained that he could not stay in the cell with Patterson any longer due to ongoing threats." (ECF No. 68, ¶ 43.) Hunter also recalls speaking with Walker on "numerous occasions" but does not provide details of what he said to Walker. (*Id.*, ¶ 48.)

Hunter thinks he had a conversation with Walker around August 7 or 9, 2017. (ECFNo. 68, ¶ 41.) After the conversation, Walker assisted Hunter in filing an inmate

---

[2] It is unclear from the record, including from a review of the copy of the form Hunter attached to his complaint, whether the form was dated May or June.

5

complaint through the Inmate Complaint Review System. (*Id.*, ¶ 49.) Walker suggested to Hunter that he include in the complaint the fact that Patterson threatened to beat him with a cribbage board. (*Id.*, ¶ 45.) Walker also told Hunter how and where to submit the inmate complaint. (*Id.*, ¶ 46.) The defendants dispute the dates on which Hunter says he spoke with Walker, pointing out that Walker did not work on those dates. (ECF No. 66, ¶¶ 77-79) However, they do not explain why the specific dates matter as long as Walker admits to having spoken with Hunter about Hunter's issues with his cellmate. (ECF No. 68, ¶ 43.)

*The December 6, 2017, Fight*

On December 6, 2017, non-defendant Sergeant Robert Wilcox, to whom Mueske delegated the responsibility of managing the day-to-day bed assignments, decided to move Patterson that day to another cell on another unit because Patterson was causing "negative interactions" within the unit. (ECF No. 66, ¶¶ 9, 90.) It is undisputed that Hunter's complaints were not the reason Patterson was going to be moved off of the unit. (*Id.*, ¶ 90.)

When Hunter heard that Patterson was going to be moved out of their cell, he decided to "go say goodbye" to Patterson. (*Id.*, ¶ 91.) In his deposition Hunter explained that "he and Patterson 'had a connection,' and he wanted to tell Patterson, 'I love you brother.'" (*Id.*, ¶ 92.) He also wanted to let Patterson know he did not need to worry about paying back money Patterson owed Hunter. (ECF No. 68, ¶ 60.) When Patterson saw Hunter approaching their cell, Patterson became upset and starting yelling at Hunter that he was a rat. (ECF No. 66, ¶ 94.) Hunter states that Patterson

6

"bodied him" out the door and into the dayroom. (*Id.*, ¶ 97.) Hunter then set his feet to prevent Patterson from pushing him further, and states that he turned around to try and walk away, but Patterson punched him. (*Id.*, ¶¶ 98-99.) After Hunter fell to the ground, Patterson stomped on his head. (ECF No. 68, ¶ 63.)

The defendants assert that Hunter chest-bumped Patterson first, after which Patterson punched and kicked Hunter. (ECF No. 66, ¶ 101.) Hunter disputes chest-bumping Patterson and essentially starting the fight, suggesting that his "big belly" got in the way. (*Id.*)

The defendants submitted video evidence of the fight and claim it shows that Hunter actually instigated the fight. (ECF No. 66¸ ¶¶ 99-101). The video has a partially-obstructed view of the beginning of the fight. An inmate in green, presumably Hunter, is seen walking in a common area toward a cell and then seemingly standing at the entrance to a cell. After a few moments, an inmate in khaki, presumably Patterson, takes an aggressive step toward Hunter, who assumes a defensive stance. It does not appear as if Hunter chest-bumped Patterson, although he does seem to brush Patterson with his body. Both Hunter and Patterson appear to be agitated. Patterson then starts repeatedly violently punching Hunter, knocking him to the ground. Once on the ground, Patterson repeatedly kicks Hunter and stomps on his head. (ECF No. 59-5 at 4:26-4:58).

Hunter was taken to a hospital, where he was treated for lost teeth, a swollen left eye, and an injured neck. (ECF No. 68, ¶ 66.) When he returned from the hospital, Hunter recovered in the infirmary unit for an unspecified amount of time. (*Id.*, ¶ 67.)

7

Case 2:18-cv-01500-WED   Filed 01/26/22   Page 7 of 14   Document 71

Hunter suffers permanent physical injuries as a result, including a stutter, daily headache, and memory loss. (*Id.*, ¶ 68.) He also had to have neck surgery and surgery on his shoulder. (*Id.*, ¶¶ 69, 70.) Additionally, Hunter states the assault triggered his post-traumatic stress disorder. (*Id.*, ¶ 72.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for

8

trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Hunter claims that the defendants violated his Eighth Amendment rights when they failed to prevent Patterson from attacking him by ignoring his complaints about his cellmate and his requests for a new cell placement. "A prison official is liable for failing to protect an inmate from another prisoner only if the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Gevas v. McLaughlin*, 789 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This standard contains both an objective and a subjective component. *Id.* "First, the harm to which the prisoner was exposed must be an objectively serious one." *Id.* Second, "the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

Because an inmate beating up another inmate "clearly constitutes serious harm," *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005), the objective prong is satisfied. Regarding the subjective prong, "a prisoner needs to present direct evidence of the official's state of mind," and "inferences from circumstantial evidence suffice." *Gevas*, 798 F.3d at 480. Typically, plaintiffs in failure to protect situations

9

demonstrate that officials had actual knowledge by presenting evidence that they complained to the official about a "specific, credible, and imminent risk of serious harm and identifie[d] the prospective assailant." *Id* at 481. However, "[c]omplaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* at 480-481.

A question of fact exists as to whether Mueske ignored Hunter's complaints about Patterson. In his April 12 request form, which Mueske admits receiving, Hunter stated that his "celly is always mad at me, keeps threatening me." And he said he "feared for his life." According to Mueske, she met with Hunter because she was concerned about the threat to Hunter's life. (ECF No. 55, 47.) However, Hunter denies that Mueske spoke or met with him to discuss his complaint. Taking the facts in a light most favorable to Hunter, then, Mueske knew by on or about April 12 that Hunter alleged that Patterson caused him to fear for his life and did nothing about it.

Nonetheless, the circumstances of the December 6 fight render this question of fact immaterial. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) ("In order to succeed in a § 1983 suit, a plaintiff must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.") (emphasis in original). Even accepting Hunter's version of events, Mueske's indifference was not the cause of any injuries he sustained at the hands of Patterson. The last time Hunter contacted Mueske about his cellmate was either May or June. There is no evidence in the record that Hunter made Mueske aware of any

10

further issue or incident between him and Patterson in the months between June and December.

In fact, the evidence is that Hunter and Patterson were getting along. On the day of the fight, Hunter stated in his deposition that he went to say goodbye to Patterson because "he and Patterson 'had a connection,' and he wanted to tell Patterson 'I love you brother.'" (ECF No. 66, ¶ 92.) Hunter also wanted to tell Patterson that he was going to forgive Patterson's debt to him. (*Id.*) According to the video, Hunter initiated a conversation outside of their cell just prior to the fight. The video is partially obscured, and there is no audio, so the court cannot know what was said. But whatever Hunter said provoked Patterson, resulting in the beating. Thus, while Mueske may have been deliberately indifferent to the risk Patterson posed to Hunter months before, no reasonable factfinder could conclude that that indifference resulted in Hunter being beaten up by Patterson half a year later. Therefore, summary judgment is granted in Mueske's favor.

Regarding Walker, the last time Hunter complained to Walker was a little under four months before the December fight took place. Hunter establishes that at some point (though it is unclear from the record exactly when) Walker knew that Patterson had threatened to beat Hunter with a cribbage board. This is a specific threat. However, Walker was not deliberately indifferent to the threat. According to Hunter's own version of the events, Walker, who had no authority to dictate housing assignments, helped Hunter bring the issue to the attention of prison administration by filing an inmate complaint through the Inmate Complaint Review System. No

reasonable factfinder could conclude that Walker deliberately disregarded the risk that Hunter brought to his attention.

Regarding the other specific threat Hunter introduced, that Patterson would "whoop his ass," Hunter presents no evidence that either defendant actually knew of that threat. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). "It is therefore incumbent on the party opposing a summary judgment motion to 'inform the district court of the reasons why summary judgment should not be entered'" *Reed v. Brex, Inc.*, 8 F. 4th. 569, 578 (7th Cir. 2021) (quoting *Riely v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)). Because Hunter did not tell the court when and to whom Hunter communicated this threat, it is does not provide a basis for denying the defendants' motion for summary judgment.

The defendants also argued that they were entitled to qualified immunity. Because the court grants summary judgment on the merits, it need not address the qualified immunity argument.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 53) is **GRANTED**.

12

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 26th day of January, 2022.

                    BY THE COURT

                    *William E. Duffin*
                    WILLIAM E. DUFFIN
                    United States Magistrate Judge